BEER, Judge.
Mrs. Betty Boucher is a state certified teacher with professional experience in several parishes over a twenty-year span. Since 1973, she taught kindergarten at the Johnson Lockett Elementary School, where she claims to have been physically assaulted *1126 by irate parents on two separate occasions allegedly Occurring in May, 1975. Then, following summer vacation, she returned, on August 26, 1975, to begin the fall term. On September 9,1975, another irate parent, Mrs. Zemenia Barbino, allegedly assaulted her, resulting, she claims, in temporary physical disability and, more or less, permanent mental upset.
The last episode allegedly necessitated treatment at the emergency room of Methodist Hospital. On September 12, 1975, she was seen by Dr. J. Terry Segurra, who diagnosed her physical injuries as contusion and strain of the cervical and lumbosacral spine and contusion of the skull. Valium and codeine were prescribed to relieve the pain and muscle tension.
Noticing anxiety and depression symptoms over the course of subsequent visits, Dr. Segurra referred her to Dr. Hiram G. Haynie, Jr., a psychiatrist. Dr. Segurra discharged her on January 27, 1976, as physically able to return to work as a kindergarten teacher. However, Dr. Haynie is of the view that she has become disabled from teaching in any situation which requires contact with black adult parents or black teachers as a cumulative result of the episodes noted above.
At the trial, Boucher testified that on the date of the third alleged incident (September 9, 1975), her kindergarten class was in full session. Due to the hot weather, the classroom door was open. Mrs. Barbino entered and pushed aside an easel as she approached Boucher, who described the incident:
“I was deathly terrified. I would not send Mrs. Bailey (a teacher’s aide who testified at the trial) out of the room because if I had sent her I knew that I would not be there in a live state when she got back, so I couldn’t send her anywhere. I had to have her right there. The woman pushed me and she was cursing and screaming and when she knew I was afraid she pushed me more and she cursed and screamed more and she punched me about seven times and finally I tried to get past her. There was no way I could get past her except to go between her and the table of children. She pushed me over the children and I hurt the inside — ”
As for her injuries, Boucher testified: “I fell over the chair and the inside of my right knee was hurt, the knee cap. The left knee inside was hurt and my left knee cap was purple and my elbow was black and my finger was hurt and I sustained a bruise on this arm when I reached over. When I fell my back was twisted and I had trouble getting up and I had pain in my back.”
Thereafter,
“. . . she pushed me about four more times and was screaming and cursing and I tried to get behind Mrs. Bailey because I felt safer. I don’t know how else to put it. If you’re a coward, you’re a coward.”
Wilma Bailey, the teacher’s aide, testified that she did not see Barbino strike Boucher. Nor did Bailey see Boucher being shoved over or across a table, although she saw Barbino shove Boucher’s shoulder. However, Bailey did hear Barbino’s profane expressions of contempt and could perceive that Boucher was in fear as a direct result. After the incident, Boucher appeared upset and nervous, complained of pain and showed Bailey her knees which appeared bruised. Bailey further testified that the entire incident took place in the time interval of approximately fifteen minutes and that Boucher stayed at work for the remainder of the school day.
Dr. Hiram G. Haynie, Jr., a psychiatrist, testified that he first examined Boucher on October 22, 1975, and concluded, at that time, that she was mildly depressed and markedly anxious when she was talking about school matters, particularly the alleged assaults. Dr. Haynie described Boucher as being in a precarious emotional state which resulted in a belief that she was persecuted by blacks. However, Dr. Haynie observed that Boucher “very likely could function as comfortably as any of us through the coming years” if she was not *1127 obliged to be in contact with black parents. He describes this as follows:
“I don’t recall her ever expressing any fear of the students; that was not the concern. The concern was that what would happen would be a repetition of what had' happened before, that a parent would come in from without the school and assault her and she felt that . there was no provision being made by the school for security and felt that the principal there did not maintain discipline and so on.”
On cross-examination, Dr. Haynie expressed his opinion that she was not prejudiced against black children — only black adults who were “ruining the school system and who subject her to physical danger . . ”
In Dr. Haynie’s opinion, Boucher could not teach at a racially integrated school because she:
“. . . had become extremely prejudiced toward black people and I had my doubts as to whether she was ever going to be able to function in a school placement that would involve racially mixed faculty even because of her prejudice.”
He felt that the alleged instances of assault were the cause of Boucher’s emotional difficulties and that these difficulties formed a basis for her alleged disability. Nevertheless, in a letter to the Assistant Superintendent of the school board, Dr. Haynie qualified his opinion by stating “(i)f there is such a thing as an all white setting with respect to teachers and students, I would not regard Mrs. Boucher as being disabled at present.”
Boucher’s emotional problem is categorized as fear of black adults. Apparently, this neurotic bitterness does not extend to include black children since the psychiatric testimony acknowledges that Boucher would have no difficulty teaching as long as she had no contact with black parents or black faculty.
The trial court concluded that Boucher was disabled from working as a teacher in the New Orleans public school system and made the further observation that:
“Disqualification from work in the public schools so substantially diminishes the plaintiff’s ability to compete in the teacher job market, that it constitutes disability ‘to perform the duties in which she was customarily engaged when injured or duties of the same or similar character, nature and description for which she was fitted by education, training and experience.’
“Even ignoring the job advantages of work in the public. school system, (of which there is no proof, and which may have qualified public school teaching as a separate job category distinct from teaching in the private sector), the prospect of the plaintiff’s gaining employment in one of the relatively few all white private schools is so speculative that she must nevertheless be deemed partially disabled.”
The Orleans Parish School Board (hereafter, “school board”) appeals on constitutional and factual grounds.
We reject, out of hand, the unacceptable contention that plaintiff’s claim is based “solely upon racial prejudice” and that the district court has made “an unconstitutional award” in violation of the 14th Amendment of the United States Constitution and Article 1, Sections 3 and 12 of the Louisiana Constitution of 1974.
The able trial judge properly addressed this matter as a compensation claim based upon markedly unusual circumstances. Though we may differ with the trial court insofar as the ultimate outcome of this litigation is concerned, we are completely in accord with that court’s apparent rejection of constitutional arguments which have no place in this litigation.
On the other hand, we find that the generally undisputed facts of this case require further consideration in two areas which, in some respects, overlap.
Those areas, which we now address, are as follows:
1. Has Boucher’s alleged disability foreclosed a sufficiently broad spectrum of her otherwise available employment opportuni *1128 ty to form a basis for the trial court’s award, and
2. Has she carried the burden of proof with respect to her alleged disability.
Addressing the first of these queries, we are of the view that the record can support the trial court’s conclusions even though we are impressed by and take note of the very substantial number of possible instances where Boucher’s employment as a teacher by the school board could result in her non-exposure to any, or to a very minuscule number of, potentially irate black parents or potentially hostile black faculty.
We turn, then, to a consideration of the alleged disability:
The record is clear that since the alleged incident of September 9, 1975, Boucher has made absolutely no effort whatsoever to return to teaching. Quite the contrary, she has moved, with her family, to Slidell, Louisiana, where her husband now operates a marina with help from her and other family members. Pretermitting the possibility of her continued employment by the school board, her reason for being unwilling to even look into or consider the possibilities of employment in such private or parochial schools as could guarantee her non-exposure to those elements which she fears are that she has no “religious training” coupled with the following verbiage which we quote directly from her testimony:
“I don’t trust anybody to take care of me. I don’t know whether I would be safe or not. How do I know this wouldn’t happen again? There is no way I could control the world. I can control myself and stay in my room and lock the door, but some day I’ve got to open it because I had to open it the day Mrs. Barbino got in there when the door had been locked for months before. You have to go out in the world sometime.”
Although the record contains essentially unrefuted evidence of the fact that Boucher’s present alleged condition (however it might be defined in psychiatric terms) is proximately related to the incident or incidents of abuse at the hands of an irate parent or irate parents, the actual description of her condition is harder to pin down. That portion of Dr. Haynie’s testimony upon which appellee most strongly relies and which is quoted in her brief is as follows:
. . She was mildly anxious, I would say, throughout the interview although markedly anxious when she was talking about school matters, in particular the three assaults which she had suffered over the previous year. I had some questions of depression. I finally concluded that she was mildly depressed. Her husband, I spoke to him in the waiting room afterwards, and he emphasized he felt she was depressed. This was, I would say, a mild state of depression. With regards to the presence of a schizophrenic illness, as I indicated in my report to Dr. Segurra or the School Board, I felt that she was in a very precarious emotional state and might well worsen, that is, become overtly psychotic, overtly out of contact with reality and if she were to do this I thought it probably would take a paranoid type of schizophrenia form. It was a kind of border line, subtle incipient sort of thing. It just intuitively seemed to me that she might, if she got any more upset, that she might conceivably come out of contact with reality.”
The only unconditional, conclusive observation in that testimony is that Boucher was mildly depressed. The psychiatrist describes the other possibilities as “a kind of border line subtle incipient sort of thing.” He bases such additional conclusions as might be gleaned from his testimony as intuitive and then he conjectures that “she might conceivably” have further mental difficulties. This kind of testimony, considered in light of the clear and undisputed fact that Boucher has made no attempt whatsoever under any circumstances to even set foot back in any classroom, causes us much concern.
There is no. doubt that physical manifestation of a traumatic neurosis or conversion reaction which results in actual *1129 physical disability is compensable. The characteristic of conversion hysteria is the substitution of physical signs and symptoms for anxiety. It is, essentially, the transformation of an emotional upset into a physical manifestation. That this may happen is no longer open to serious question by either physicians or by the courts of this state. Just as true is the fact that although mental anguish may be compensable in certain tort actions, the law, as it addresses this problem in .connection with workmen compensation claims, properly contemplates the imposition of a burden of proof that requires a showing of disability in the form of some physical manifestation of the alleged neurosis.
In Carter v. Avondale Shipyards, Inc., 308 So.2d 472 (La.App. 4th Cir., 1975), plaintiff sued for total disability premised on traumatic neurosis. Although there was no physical disability after a work-related accident, we found that plaintiff’s neurosis caused uncontrollable twitching or jerking of the left arm. We observed: “Dr. Ritter characterized the psychiatric problem of plaintiff as one of a conversion reaction in which the mental problem manifests itself in an outward or physical way.” Later, we concluded: “The accident triggered plaintiff’s conversion reaction manifesting itself in a specific physical symptom resulting in his disability. This triggering role is sufficient to support an award under our Workmen’s Compensation Act.” (Emphasis ours.)
In Stanford v. Long & Wolfe, 199 So. 608 (La.App. 1st Cir., 1941), plaintiff’s left foot was lacerated in a job-related injury and subsequently recovered sufficiently such as to allow him to resume his former duties. However, plaintiff claimed to be totally disabled due to subjective symptoms of pain, uncorroborated by medical testimony. In concluding that the plaintiff had failed to prove to a legal certainty that he was disabled from engaging in his usual occupation, the court held that while traumatic hysteria is recoverable under the Louisiana Workmen’s Compensation Law, “. there should be a sound cause and good reason for the mental condition which su-perinduces a fear of pain in the individual strong enough to render him totally disabled.” The court went on the state that a mere possibility or probability of disability is insufficient to prove the disability which must be proven on “a legal certainty.”
The Stanford case was cited in Porter v. W. Horace Williams Co., 9 So.2d 60 (La.App. 2nd Cir., 1942), wherein plaintiff was found to have suffered from an accidental injury while on the job. The medical testimony adduced at the trial showed that any physical injuries resulting from the accident had healed at an early date after the accident, and plaintiff only suffered from “traumatic hysteria.” Nevertheless, the psychoneurosis manifested itself through physical symptoms: plaintiff’s left leg possessed no motion or sensation whereas severe shaking was observed in the right leg; plaintiff made constant complaints of pain in the lumbar back; plaintiff’s face continuously flushed; and plaintiff suffered at times from extreme perspiration. Hence, although no bone pathology was observable, plaintiff’s traumatic hysteria condition was found to be compensable.
Bynum v. Maryland Casualty Co., 102 So.2d 547 (La.App. 1st Cir., 1958), involved a plaintiff who sustained a slight hernia in one accident which became aggravated by a subsequent accident at a later date. After the second accident, the hernia was surgically repaired in a completely successful operative procedure. A third accident allegedly caused plaintiff further pains in the groin area. Medical testimony confirmed the possibility that plaintiff’s pain may emanate from the site of the surgical repair. A psychiatrist testified that assuming the complaints of pain had no organic basis, “plaintiff was suffering from an anxiety psychoneurosis producing genuinely felt pain (emphasis ours) resulting from the series of psychic traumas — the three accidents and the surgery involving the hernia repair — and that the last accident could be the trigger which activated the neurosis into disability.” In affirming the trial court’s award of total and permanent dis *1130 ability, the court relied upon plaintiff’s truthful complaints of pain as the disabling factor.
Similarly, Goodley v. Brunet, 150 So.2d 804 (La.App. 3rd Cir., 1963), writs ref. 244 La. 400, 152 So.2d 213, involved a physical injury to the left foot with subsequent recovery therefrom, followed by a definite neurotic condition manifested by genuinely felt pain in the leg and back on attempting to do hard work as well as a pronounced limp while walking. The court stated that “. . .a claimant is entitled to compensation for a disability caused by reason of subjective pain resulting from a mental condition or neurosis precipitated by an accident at work, even though there is no physical basis for such pain. . . . ”
Even neurotic racial prejudice, which directly results from a course and scope accident and is proven to be disabling, requires compensation act coverage. However, the bizarre nature of this claim coupled with the oft expressed care which is required of the judicial process when it addresses the subjective area of neurosis-triggered disabilities cause us to be much concerned with the quality of the proof. Even so, if the proof is there, plaintiff should prevail. Here, we do not find sufficient proof to support the plaintiffs claim for disability. The proof, though existent, is so weak and so vague and so conjectural, and so remote that, when considered in its entirety, it fails to measure up even to the level at which we would be restrained from substituting our view for that of the trial court.
Accordingly, the judgment of the Civil District Court for the Parish of Orleans is annulled, set aside and reversed, and it is now ordered that the claim of Betty Boucher, wife of Paul Boucher, against Orleans Parish School Board be dismissed, at her costs.

REVERSED AND RENDERED.

BOUTALL, J., dissents with written reasons.
GULOTTA, J., dissents for the written reasons assigned by BOUTALL, J.